## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| UNION HOME MORTGAGE CORP., | ) | CASE NO. 1:23-cv-857 |
| | ) | |
| Union Home, | ) | JUDGE CHARLES E. FLEMING |
| | ) | |
| v. | ) | |
| | ) | |
| CHRISTOPHER FRATELLI, | ) | **MEMORANDUM OPINION AND** |
| | ) | **ORDER** |
| Fratelli. | ) | |
| | ) | |
| | ) | |

Before the Court is Plaintiff's Motion for Preliminary Injunction ("Injunction Motion")
(ECF No. 12).  For the reasons discussed herein, the Injunction Motion is **GRANTED IN PART
AND DENIED IN PART**.

I.      **FACTUAL BACKGROUND**

In 2004, Christopher Fratelli started working as a loan officer for Countrywide in the
Harrisburg, Pennsylvania area.  (ECF No. 55, PageID #1648–50; ECF No. 57-1, PageID #1818).
He continued working in the residential home loan industry at a mortgage company (GMH) and
several banks (Integrity Bank and Wells Fargo) as a branch manager and/or loan officer.  (ECF
No. 57-1, PageID #1815–18).   In December 2015, Fratelli began working for Union Home
Mortgage Corp. ("Union Home") as a branch manager and loan officer at Union Home's Camp
Hill, Pennsylvania branch.  (ECF No. 38, ¶ 15; ECF No. 57-1, PageID #1815; ECF No. 55, PageID
#1414, 1592).

On July 7, 2022, Union Home and Fratelli signed and executed an Employment Agreement
("Agreement").  (ECF No. 38-1).  The Agreement provides the following relevant clauses
concerning a non-compete covenant, non-solicitation covenants, confidentiality covenant, and
extension of the Agreement:

1

3. <u>Limited Non-Compete</u>.  Employee agrees they will not engage in Competitive Activity on behalf of a Competitive Entity in the Restricted Area during the Restricted Period of this Agreement, the "Restricted Period" shall be the period between the date this Agreement is executed and March 31, 2024, the "Restricted Area" shall mean any state in which Employee is legally able to originate or broker mortgages and has done so on behalf of the Company in the thirty-six (36) months preceding the termination of Employee's employment with the Company; a "Competitive Entity" shall be any entity that competes with the Company in the home mortgage banking or brokering business; and "Competitive Activity" shall be acting in the same or similar capacity in which Employee worked for the Company and shall include, but not be limited to performing the functions of a loan officer, such as by, directly or indirectly, originating or brokering mortgages for real estate located in the Restricted Area.  For the avoidance of doubt, the fact that Employee's office after their employment with the Company concludes is located outside of the Restricted Area does not resolve whether Employee has engaged in Competitive Activity in violation of this covenant.  Further, during the Restricted Period and for one year thereafter, Employee shall not have any ownership interest in a Competitive Entity, whether as a shareholder, member, partner or otherwise, within the Restricted Area.

4. <u>Limited Non-Solicitation of Customers</u>.  During the Restricted Period and for two (2) years thereafter, Employee will not, on behalf of themselves or a Competitive Entity, directly or indirectly, solicit or divert (or attempt to solicit or divert) or accept competitive business from any customer or identified prospective customer of the Company: (i) with whom Employee had contact; or (ii) about whom Employee obtained or had access to Confidential Information, in conjunction with their employment in the thirty-six (36) months preceding the termination of Employee's employment with the Company.

5. <u>Limited Non-Solicitation of Employees</u>.  During the Restricted Period and for two (2) years thereafter, Employee shall not, directly or indirectly, on behalf of themselves or a Competitive Entity, employ or seek to employ any person who is employed by the Company or otherwise induce such person to leave his/her employment with the Company.

\* \* \*

2

8. <u>Extension if Violated; Enforcement as Written</u>. In the event Employee violates any covenant in this Agreement, the term of all covenants contained herein shall automatically be extended for a period of one (1) year after the later of (a) the date on which Employee ceases such violation; or (b) the date of the entry of a court order enforcing such covenant. Further the parties desire that the covenants contained herein be enforced to their full extent. However, in the event a court of competent jurisdiction determines such a covenant to be overly broad or otherwise unenforceable as written, the parties respectfully request that the restriction be enforced to the maximum extent permitted by law, and Employee hereby consents and agrees that the scope of such covenant may be judicially modified.

(*Id.* at PageID #908–09).

While working at Union Home, Fratelli had access to Encompass, Union Home's database/loan origination software, which contained "confidential information" on its loans, customers, and prospective customers. (ECF No. 55, PageID #1622–23; ECF No. 57-3, PageID #2129–30). Fratelli downloaded confidential information from Encompass to a personal Dropbox account weekly. (ECF No. 57-1, PageID # 1836, 1867–68, 1888–89). Using the information downloaded from Encompass, Fratelli created several lists which he uploaded to his Dropbox account and updated weekly, including a lead tracker report, pre-approval lists, a client list, and referral source list. (ECF No. 55, PageID #1626, 1636; ECF No. 57-1, PageID #1876–77; Pl.'s Exs. 14–18). Fratelli worked at Union Home for over eight years and originated loans on behalf of Union Home in both Pennsylvania and Florida. (ECF No. 55, PageID #1414–15, 1585).

Before resigning from Union Home, Fratelli had informed his supervisor and other Union Home executives that he intended to resign and move full-time to Florida. (ECF No. 55, PageID #1423, 1542, 1601; ECF No. 57-1, PageID #1810–11, 1944–45; ECF No. 57-3, PageID #2282–83, 2331, 2342). Fratelli also informed Anita Weikel (his loan assistant and a Union Home employee) that he planned to leave Union Home to work for EMM Loans, LLC ("EMM"), and provided her with an application for employment and a point of contact at EMM. (ECF No. 26-3, PageID #572; ECF No. 55, PageID #207–08; ECF No. 57-1, PageID #1775–75; Pl.'s Ex. 2,

3

FRATELLI_359–66). In early March 2023, Union Home terminated Ms. Weikel's employment as part of a reduction in force and she began working at EMM by the end of the month. (ECF No. 55, PageID #1431–32, 1539; ECF No. 57-4, PageID #2505, 2521–22).

On April 3, 2023, Fratelli officially resigned his employment with Union Home, and immediately began working for EMM, a competitor of Union Home, as Regional Vice President of Sales. (ECF No. 55, PageID #1423, 1570–71; ECF No. 57-1, PageID #1767; Pl.'s Ex. 3). In his current position at EMM, Fratelli has originated loans in Pennsylvania on behalf of EMM and works out of a personal office located in Camp Hill, Pennsylvania—with most of these originated loans coming from the surrounding area. (ECF No. 55, PageID #1570–71, 1579–80, 1604–05; ECF No. 57-1, PageID #1769–70).

## II.    PROCEDURAL HISTORY

On April 24, 2023, Union Home filed a verified complaint against Fratelli seeking damages and injunctive relief and alleging claims for misappropriation of trade secrets under federal and state law, breach of contract, and breach of duty. (ECF No. 1). Union Home filed the Injunction Motion in June 2023. (ECF No. 12). Union Home requested a preliminary injunction that enjoined Fratelli from:

> 1. Managing operations of a competing mortgage company office—including recruiting, training, and directing a retail loan sales team—or serving as a producing loan officer or any similar role originating and generating loans until March 31, 2024;
>
> 2. Soliciting or accepting business from Union Home's customers, prospective customers, and referral sources with whom Fratelli previously had contact or about whom Fratelli obtained confidential information, until March 31, 2026; and
>
> 3. Using and/or disclosing Union Home's confidential and/or trade secret information, including but not limited to information of referral sources and customers or prospective customers.

(*Id.* at PageID #101).

On October 18, 2023, Union Home filed a supplemental memorandum in support of the Injunction Motion. (ECF No. 26). Union Home amended its request for preliminary injunctive relief by: (i) narrowing the geographic enforcement of the non-compete provision in the Agreement to "Identified Counties"; (ii) extending enforcement of the non-compete provision to one year after the Court issued an order granting the Injunction Motion; and (iii) further enjoining Fratelli from employing or seeking to employ any person who was an employee of Union Home. (*Id.* at PageID #240–43, 246). Union Home explained that the Identified Counties were the 22 counties (18 in Pennsylvania and 4 in Florida) where Fratelli had originated a loan for Union Home in the three years before his resignation, listed as:

> Pennsylvania: Adams, Allegheny, Bedford, Columbia, Cumberland, Dauphin, Franklin, Huntingdon, Juniata, Lancaster, Lebanon, Lycoming, Northumberland, Perry, Schuylkill, Snyder, Sullivan, and Wayne
>
> Florida: Palm Beach, Polk, Sarasota, and St. Johns.

(*Id.* at PageID #242 (citations omitted)). Fratelli filed a timely response in opposition to the Injunction Motion, (ECF No. 41), and Union Home filed a timely reply in support, (ECF No. 42).[1]

On February 28, 2024, Union Home filed an amended complaint.[2] (ECF No. 38). The pleadings now assert nine causes of action: (i) violation of the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836, *et seq.* (Count I); (ii) violation of the Ohio Uniform Trade Secrets Act ("OUTSA"), Ohio Rev. Code § 1333.61, *et seq.* (Count II); (iii) breach of contract – non-compete clause (Count III); (iv) breach of contract – duty of loyalty (Count IV); (v) breach of common law duty of loyalty (Count V); (vi) breach of contract – duty of confidentiality (Count

---

[1] The Court set filing deadlines for the parties' response and reply briefs pursuant to the parties' joint stipulated briefing schedule (ECF No. 37). (Order [non-document] dated Apr. 10, 2024).

[2] The amended complaint is largely identical to the original complaint, with some added factual allegations and the addition of two claims for breach of contract relating to non-solicitation of employees and customers. (*Compare* ECF No. 1, *with* ECF No. 37).

VI); (vii) breach of contract – use of Union Home electronic resources (Count VII); (viii) breach of contract – non-solicitation of customers (Count VIII); an (ix) breach of contract – non-solicitation of employees (Count IX).  (*Id.* at PageID #895–903).

The Court held an evidentiary hearing on June 6, 2024, where it heard testimony from Fratelli and Roger Bryan Wright, a corporate representative and division manager for Union Home.  (ECF Nos. 52, 55).  After the evidentiary hearing, the parties filed their respective post-hearing briefs.  (ECF Nos. 56, 59, 61).

## III.  LEGAL STANDARD

A preliminary injunction "is an extraordinary remedy never awarded as of right."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).  "A district court must balance four factors when considering a motion for a preliminary injunction: (1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury absent the injunction; (3) whether the injunction would cause substantial harm to others; and (4) whether the public interest would be served by the issuance of an injunction."  *Bays v. City of Fairborn*, 668 F.3d 814, 818–19 (6th Cir. 2012) (citing *Certified Restoration Dry Cleaning Network, LLC v. Tenke Corp.*, 511 F.3d 535, 542 (6th Cir. 2007).  "But where there is no likelihood of either success on the merits or irreparable harm, an injunction is unwarranted— regardless of the showing on the other factors."  *Union Home Mortg. Corp. v. Cromer*, 31 F.4th 356, 366 (6th Cir. 2022).  Ultimately, whether to grant such relief is a matter within the discretion of the district court.  *See Certified Restoration*, 511 F.3d at 540–41.

## IV.  DISCUSSION

### A.  Likelihood of Success on the Merits

First, the Court must consider whether Union Home demonstrated a strong likelihood of success on the merits of the claims underlying the preliminary injunction.  *Certified Restoration*,

511 F.3d at 543.  "Although no one factor is controlling, a finding that there is simply no likelihood of success on the merits is usually fatal."  *Gonzales v. Nat'l Bd. of Med. Exam'rs*, 225 F.3d 620, 625 (6th Cir. 2000).  Although Union Home does not have to prove their case in full at this stage in the proceedings, it must show more than a mere possibility of success.  *See Certified Restoration*, 511 F.3d at 543.

1.    *Misappropriation of Trade Secrets under Federal and Ohio Law*

Union Home alleges that Fratelli misappropriated its trade secrets in violation of the Defend Trade Secrets Act ("DTSA") and the Ohio Uniform Trade Secrets Act ("OUTSA").  (ECF No. 38, PageID #895–98).  The requirements for establishing misappropriation of trade secrets are largely the same under Ohio and federal law; so the Court will analyze the claims together when considering the likelihood of success on the merits.  *See Aday v. Westfield Ins.*, 486 F. Supp. 3d 1153, 1160 (S.D. Ohio 2020), *aff'd in part, rev'd in part on different grounds*, 2022 U.S. App. LEXIS 2319, at *2 (6th Cir. Jan. 24, 2022); *C.R.H. Indus. Water, LLC v. Eiermann*, No. 1:23-cv-01805, 2024 U.S. Dist. LEXIS 211678, at *8 (N.D. Ohio Nov. 21, 2024) ("Courts consider DTSA and OUTSA claims together because the definition and requirements are generally the same.").

To prevail on a misappropriation of trade secrets claim under Ohio law, Union Home must prove: "(1) the existence of a trade secret; (2) acquisition of the trade secret as the result of a confidential relationship or through improper means; and (3) an unauthorized use of the trade secret."  *Novus Grp., LLC v. Prudential Fin., Inc.*, 74 F.4th 424, 427–28 (6th Cir. 2023) (citing *Tomaydo-Tomahhdo L.L.C. v. Vozary*, 2017-Ohio-4292, 82 N.E.3d 1180, 1184 (Ohio Ct. App. 2017), and Ohio Rev. Code § 133.61(B)(1)).  "To prevail on a claim under the DTSA, a plaintiff must show: (1) the existence of a protectable trade secret; (2) misappropriation of the trade secret by Fratelli; and (3) that the trade secret is related to a product or service used in interstate

7

commerce." *Endless River Techs. LLC v. Trans Union LLC*, 2022 U.S. Dist. LEXIS 19217, at *23 (N.D. Ohio Feb. 22, 2022).

Ohio law defines trade secrets as "information, including the whole or any portion or phrase of any scientific or technical information, design, process, procedure, formula, pattern, compilation, program, device, method, technique, or improvement, or any business information or plans, financial information, or listing of names, addresses, or telephone numbers" that satisfies two conditions.  Ohio Rev. Code § 1333.61(D).  First, the information must "derive[] independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use." Ohio Rev. Code § 1333.61(D)(1).  Second, the information must be "the subject of efforts that are reasonable under the circumstances to maintain its secrecy."  Ohio Rev. Code § 1333.61(D)(2).  Information that constitutes a trade secret under Ohio Rev. Code § 1333.61(D) still constitutes a trade secret if the information was memorized.  *Al Minor & Associates v. Martin*, 881 N.E.2d 850, 855 (Ohio 2008).

Under Ohio law, the Court analyzes six factors when considering a trade secret claim:

(1)The extent to which the information is known outside the business; (2) the extent to which it is known to those inside the business, i.e., by the employees; (3) the precautions taken by the holder of the trade secret to guard the secrecy of the information; (4) the savings effected and the value to the holder in having the information as against competitors; (5) the amount of effort or money expended in obtaining and developing the information; and (6) the amount of time and expense it would take for others to acquire and duplicate the information.

*State ex rel. Besser v. Ohio State Univ.*, 732 N.E.2d 373, 378 (Ohio 2000).  Federal law defines trade secret as "all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether

tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing" where the owner has "taken reasonable measures to keep such information secret" and the "information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information."  18 U.S.C. § 1839(3).  Under Ohio law, customer lists can constitute trade secrets.  *Thermodyn Corp. v. 3M Co.*, 593 F. Supp. 2d 972, 986 (N.D. Ohio 2008); *Salemi v. Cleveland Metroparks*, 145 Ohio St. 3d 408, 2016-Ohio-1192, 49 N.E.3d 1296 (2016) ("Customer lists have been held to constitute trade secrets.").  In fact, they are presumptively entitled to trade-secret protection.  *Total Quality Logistics, LLC v. Eda Logistics LLC*, No. 23-3713, 2024 U.S. App. LEXIS 25149, at *18 (6th Cir. Oct. 2, 2024) (citing *Besser v. Ohio State Univ.*, 89 Ohio St. 3d 396, 2000-Ohio-207, 732 N.E.2d 373, 380 (Ohio 2000)).  Federal courts have similarly held that customers list can also constitute "trade secrets" under the DTSA.  *See, e.g.*, *Corp. Lodging Consultants v. Szafarski*, No. 1:21-cv-1611, 2021 U.S. Dist. LEXIS 157343, at *20 (N.D. Ohio Aug. 20, 2021) (collecting cases); *Shepard v. Lokring Tech., LLC*, No. 1:20-cv-02488, 2023 U.S. Dist. LEXIS 146280, at *13 (N.D. Ohio Aug. 21, 2023); *Orient Turistik Magazacilik San ve Tic Ltd. STI v. Aytek USA, Inc.*, No. 22-4864 (SDW) (JBC), 2023 U.S. Dist. LEXIS 87130, at *11–12 (D.N.J. May 18, 2023).

Plaintiffs can show misappropriation of their trade secrets under federal and Ohio law by establishing disclosure or use of a trade secret without express or implied consent by a person who, at the time of disclosure or use, knew or had reason to know that knowledge of the trade secret was: (i) acquired under circumstances giving rise to a duty to maintain secrecy of the trade secret or limit the use of the trade secret; or (ii) derived from a person who owed a duty to plaintiffs to

maintain the secrecy of the trade secret.    18 U.S.C. § 1839(5)(B); Ohio Rev. Code § 1333.61(B)(2)(b).

a.    Existence of a Trade Secret

Union Home has identified its alleged trade secrets as spreadsheet compilations of non-public customer and referral source information taken from Union Home's secure Encompass database that were made by Fratelli and uploaded to his DropBox account, which include: (i) a 2022 Lead Tracker Report (Pl.'s Ex. 14); (ii) Pre-Approval Lists (Pl.'s Exs. 15, 16); (iii) Customer Lists (Pl.'s Exs. 17, 19), and (iv) a Referral Source List (Pl.'s Ex. 18) (collectively, the "Confidential Information").  (ECF No. 26, PageID #235–37; ECF No. 56, PageID #1729–31). Mr. Wright testified that Encompass was password protected, all employees with access to the above confidential information must sign a confidentiality agreement, and Union Home has written policies about the proper handling of any confidential information.[3]  (ECF No. 55, PageID #1419–20, 1434–37, 1442, 1562–65; ECF No. 57-3, PageID #2245–46, 2381–83; *see also* Pl.'s Ex. 25, §§ 3–4).    Union Home alleges that Fratelli improperly acquired the Confidential Information and continues to use and disclose these "trade secrets" to the detriment of Union Home.  (ECF No. 26, PageID #235–37; ECF No. 38, PageID #895–98).

Fratelli argues that the Confidential Information is not a trade secret because most of the customer information and all the referral source information are publicly available.  (ECF No. 59, PageID #2914).  He points to Mr. Wright's testimony confirming that the information comprising

---

[3] The Agreement defines "confidential information" as including "confidential or proprietary information or trade secrets of the [Union Home], including, but not limited to, written or electronic information: (i) disclosed to [Fratelli] or known by [Fratelli] as a result of his or her employment, (ii) which is not generally known, and (iii) which relates to or concerns the [Union Home's] business, technology, information systems, computer programs, software, customers, prospective customers, referral sources, pipelines, customer relationship management databases, suppliers, vendors, sales, marketing or finances. . . . [as well as] all information and matters specifically designated as proprietary and/or confidential by the [Union Home's] customers, referral sources, or other business partners.  (ECF No. 38-1, PageID #908–09).

the Confidential Information is available from public sources.  (ECF No. 55, PageID #1485–87, 1506–08; ECF No. 57-3, PageID #2219).  In response, Union Home contends that compilations of public information, like the Confidential Information, can constitute trade secrets.  (ECF No. 61, PageID #2934).  Fratelli counters that the Confidential Information is not a trade secret due to its compilation format because the lists could be recreated in a matter of hours through readily ascertainable information (*i.e.*, the information is not valuable).  (ECF No. 59, PageID #2915).

The Court must determine whether the Confidential Information derives economic value from "not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use."[4]  *See* Ohio Rev. Code § 1333.61(D)(1).  In that same vein, courts have held that compilations of otherwise public information can constitute a protectable trade secret so long as they provide a competitive advantage and are not readily ascertainable.  *See, e.g.*, *Collar Jobs, LLC v. Stocum*, No. 1:22-cv-1892, 2023 U.S. Dist. LEXIS 224220, at *36 (N.D. Ohio Dec. 18, 2023); *Union Home Mortg. Corp. v. Payne*, No. 1:20-cv-26, 2020 U.S. Dist. LEXIS 132097, at *18–19 (N.D. Ohio March 9, 2020).  In essence, the Court must ask whether recreating the compilations comprising the Confidential Information would require a significant amount of time and effort.  *See MP TotalCare Servs. v. Mattimoe*, 648 F. Supp. 2d 956, 966 (N.D. Ohio 2009) (finding that an employer's customer list constituted a trade secret because recreating the list "would require a large investment of time and resources"); *see also Clear Cast Grp., Inc. v. Ritrama, Inc.*, No. 1:09-cv-0169, 2012 WL 13149225, at *13 (N.D. Ohio Feb. 1, 2012) (providing that a district court must consider "the amount of effort or money expended in obtaining and

---

[4] Although Union Home alleges and provides evidence that Fratelli's handling of the Confidential Information violated company policy and certain provisions of the Agreement, (ECF No. 56, PageID #1731–32), such violations (even if proven) are not dispositive as to whether the Confidential Information constitutes a protectable trade secret under Ohio and federal law.  In this instance, those violations primarily reflect the efforts taken by a Union Home to keep the Confidential Information secret (part of the trade secret analysis) and whether Fratelli violated provisions of the Agreement concerning the handling of "confidential information."

developing the information, as well as the amount of time and expense it would take for others to acquire and duplicate the information"); *Skf United States Inc. v. Zarwasch-Weiss*, No. 1:10-cv-1548, 2011 U.S. Dist. LEXIS 167027, at *44 (N.D. Ohio Feb. 3, 2011) ("If time and resources must be expended to create a list, the list may be a trade secret even if each item on the list is publicly available[.]").

The Court finds that the Confidential Information, particularly the various customer lists, are protectable trade secrets from which Union Home derives independent economic value.  Those compilations are fairly large and, even though much of the information comprising those lists is publicly available, a third party would not necessarily be able to identify Union Home's current and prospective customers without access to Union Home's internal, password protected database. Fratelli makes no argument on the ease of replicating those compilations, only putting forth evidence related to recreating the "Relator Source List."  (*See* ECF No. 59, PageID #2915 (citing ECF No. 55, PageID #1694)).  The Court finds that these customer list compilations fall within the definition of a trade secret under Ohio and federal law and Union Home took reasonable measures to keep that information secret.[5]

As for the Referral Source List, the conclusion is different.  Fratelli specifically testified that he could recreate that compilation in a matter of hours from publicly available information, and he did just so after starting his employment at EMM.  (ECF No. 55, PageID #1644, 1694). Fratelli testified that he has maintained a copy of personal referral sources that he cultivated before his employment at Union Home, and he uploaded those sources to Union Home's database when

---

[5] The Court finds Fratelli's arguments that the customer lists lack value because the information is stale to be unpersuasive.  Fratelli provides only his own testimony that the customer lists are outdated and have no value, but does not further develop and support this argument in his briefing.  Without more, the Court finds that there is independent economic value in the customer lists in the Confidential Information, which might have diminished over time but has not been entirely destroyed.

12

he started his employment with Union Home (at the direction of Union Home management).  (ECF No. 55, PageID #1663; ECF No. 57-1, PageID #1802, 1903–04).  He also testified that Union Home's National Sales Manager, Mike Jones, informed Fratelli that his book of business and its referral sources belonged to Fratelli when he joined Union Home and could be taken with him when he left.  (ECF No. 55, PageID #1664; ECF No. 57-1, PageID #1831, 1834).  Union Home has provided no explicit argument or evidence to refute Fratelli's testimony.[6]  Based on the evidence before the Court, the Referral Source List is a lengthy spreadsheet of names and contact information (work phone, cell phone, and work email) for numerous mortgage lenders and brokers.  (Pl.'s Ex. 18).  All this information is publicly available.  Although this information does have independent economic value, the Court is persuaded that it would not take a substantial amount of time, effort, and resources for Fratelli, or any other seasoned loan officer, to recreate the Referral Source List.  Thus, the Court finds that Union Home has failed to meet its burden of demonstrating that the Referral Source List is a protectable trade secret.

Thus, the Court finds that, on the evidence presented at this stage, Union Home has established that the customer lists and lead tracker reports that comprise the Confidential Information (Pl.'s Exs. 14–17) are protectable trade secrets.

b.    Misappropriation

Union Home argues that preliminary injunction hearing testimony establishes Fratelli downloaded the Confidential Information from the Encompass database, stored the information in his personal Dropbox account, retained the information after he left his employment with Union Home, and used the information while employed at EMM to the detriment of Union Home.  (ECF

_____

[6] Fratelli testified that Mike Jones was not his direct manager and the supposed conversation about keeping his book of business/referral sources occurred 9 to 10 years ago, which casts some doubt on his argument.  (ECF No. 55, PageID #1664–65, 1704–05).

No. 56, PageID #1729–31).  Fratelli argues that Union Home's claim for misappropriation of trade secrets is meritless because he: (i) has not used or accessed the Confidential Information after his resignation from Union Home (except in response to Union Home's requests for discovery); (ii) has since deleted his DropBox account and all documents contained therein, including the Confidential Information; (iii) has no access to the Confidential Information; and (iv) created a new referral source list from publicly available information.  (ECF No. 59, PageID #2913).

To demonstrate a likelihood of success on the merits of its misappropriation of trade secrets claims, Union Home has the heavy burden of demonstrating that Fratelli used the alleged trade secrets without authorization.  *See Handel's Enters., Inc. v. Schulenburg*, 765 F. App'x 117, 122 (6th Cir. 2019).  Although Union Home must demonstrate *actual* misappropriation to succeed at trial, under Ohio law, the Court may grant injunctive relief upon a showing of actual or *threatened* misappropriation of trade secrets.  *See Patio Enclosures, Inc. v. Herbst*, 39 F. App'x 964, 968 (6th Cir. 2002) (citing Ohio Rev. Code § 1333.62(A)).

Here, Union Home has provided no evidence of actual misappropriation.  As noted by Fratelli, Mr. Wright testified that he has not yet acquired facts showing the actual use of the alleged trade secrets.  (ECF No. 57-3, PageID #2344–45).  Without any evidence of actual misappropriation, Union Home's argument necessarily relies on the inevitable disclosure doctrine.  Under the inevitable disclosure doctrine, a threatened misappropriation of trade secrets can be shown in circumstances where "an employee with detailed, comprehensive knowledge of an employer's trade secrets and confidential information begins employment with a competitor in a substantially similar position," because the employee's "disclosure of trade secret information is inevitable."  *MP TotalCare*, 648 F. Supp. 2d at 968–69 (citing *Berardi's Fresh Roast Inc. v. PMD Enters., Inc.*, No. 90822, 2008-Ohio-5470, ¶¶ 26–27 (Ohio Ct. App. 2008)); *see also Polymet*

14

*Corp. v. Newman*, Case No. 1:16-cv-734, 2016 U.S. Dist. LEXIS 113000, at *11–12 (S.D. Ohio Aug. 24, 2016) (citing *Proctor & Gamble Co. v. Stoneham*, 140 Ohio App. 3d 260, 747 N.E.2d 268, 279 (Ohio Ct. App. 2000)).

Union Home has provided evidence that Fratelli accessed Union Home's database, constructed compilations of information downloaded from that database (the Confidential Information), and uploaded the Confidential Information to his personal DropBox account all while he was employed with Union Home.  (ECF No. 55, PageID #1428, 1448–49, 1448–89, 1622, 1625–28).  He also had access to his DropBox account and the Confidential Information for some time after he started working at EMM, with Fratelli testifying that he deleted the DropBox account in September 2023.  (*Id.* at PageID #1637–39; ECF No. 41-6).  As discussed more fully later in this opinion, Fratelli's current position at EMM is substantially similar to his former position at Union Home, with both involving duties related to originating and facilitating loans for real estate. Union Home has also provided other circumstantial evidence of misappropriation: that Fratelli has been providing services to customers on Union Home's "Pre-Approved List" since he joined EMM.  (ECF No. 55, PageID #1630–35).  Based on the above circumstantial evidence, the Court finds that Union Home has a strong likelihood of success in establishing that Fratelli misappropriated trade secrets (the relevant customer lists) at this stage of the proceedings. Accordingly, the Court finds that Union Home has established a strong likelihood of success on the merits that Fratelli violated the DTSA and OUTSA.

2.      *Breach of Contract – Non-compete and Non-solicitation of Customers*

Union Home asserts several breach of contract claims against Fratelli.  (ECF No. 38, PageID #898–903).  "Under Ohio law, the elements of a breach of contract claim are: (1) the existence of a contract; (2) performance by the plaintiff; (3) breach by the defendant; and

(4) damage or loss to the plaintiff as a result of the breach." *V & M Star Steel v. Centimark Corp.*, 678 F.3d 459, 465 (6th Cir. 2012); *see also Lucarell v. Nationwide Mut. Ins.*, 97 N.E.3d 458, 469 (Ohio 2018).  In this section, the Court will focus on Union Home's breach of contract claims related to the non-compete and non-solicitation of customers provisions.  The relevant portions of the Agreement state:

> 3. <u>Limited Non-Compete</u>.  Employee agrees they will not engage in Competitive Activity on behalf of a Competitive Entity in the Restricted Area during the Restricted Period of this Agreement, the "Restricted Period" shall be the period between the date this Agreement is executed and March 31, 2024, the "Restricted Area" shall mean any state in which Employee is legally able to originate or broker mortgages and has done so on behalf of the Company in the thirty-six (36) months preceding the termination of Employee's employment with the Company; a "Competitive Entity" shall be any entity that competes with the Company in the home mortgage banking or brokering business; and "Competitive Activity" shall be acting in the same or similar capacity in which Employee worked for the Company and shall include, but not be limited to performing the functions of a loan officer, such as by, directly or indirectly, originating or brokering mortgages for real estate located in the Restricted Area. . . .

> 4. <u>Limited Non-Solicitation of Customers</u>.  During the Restricted Period and for two (2) years thereafter, Employee will not, on behalf of themselves or a Competitive Entity, directly or indirectly, solicit or divert (or attempt to solicit or divert) or accept competitive business from any customer or identified prospective customer of the Company: (i) with whom Employee had contact; or (ii) about whom Employee obtained or had access to Confidential Information, in conjunction with their employment in the thirty-six (36) months preceding the termination of Employee's employment with the Company.

(ECF No. 38-1, PageID #908).

There is no dispute that the Agreement was signed and executed by both parties and no argument that the Agreement is not a valid and binding contract between the parties.  (*See id.* at PageID #910).  Fratelli primarily argues that the non-compete and non-solicitation of customers provisions are unreasonable and therefore unenforceable.  (ECF No. 41, PageID #939–44; ECF No. 59, PageID #2905–13).  He separately argues that he has not breached either provision.  (ECF No. 41, PageID #939, 944–45; ECF No. 59, PageID #2903).

16

For the non-compete provision, Fratelli contends that he is not acting in the same or similar capacity in which he worked for Union Home because his position as Regional Vice President of Sales for EMM is considerably different than his position as a branch manager for Union Home. (ECF No. 41, PageID #944–45).  He also argues that the non-compete provision does not prohibit *facilitating* the origination of mortgage loans.  (ECF No. 59, PageID #2903).  Union Home disagrees, arguing that Fratelli's core job duties at EMM and Union Home are the same, Fratelli is originating loans for EMM in Pennsylvania (an activity barred under the non-compete provision), and facilitating the origination of mortgage loans was one of Fratelli's key duties while working for Union Home.  (ECF No. 42, PageID #1113–14; ECF No. 61, PageID #2928–29).

Union Home has established a strong likelihood that Fratelli breached the non-compete provision.  The evidence before the Court demonstrates that Fratelli is acting in a similar capacity at EMM to which he worked at Union Home.  One of Fratelli's primary duties as a branch manager at Union Home was to originate loans and grow the residential mortgage business for Union Home in the Camp Hill, Pennsylvania area/market.  (ECF No. 55, PageID #1414–15, 1571).  Fratelli testified that one of his duties in his current position at EMM is to originate loans on behalf of EMM.  (ECF No. 55, PageID #1570–71, 1602).  There is no dispute that Fratelli has been originating loans for EMM (a "Competitive Entity") in and around the Camp Hill market and the same geographic area he originated loans for Union Home (the "Restrictive Area").  (*Id.* at PageID #1604–05).  Fratelli might not be performing the precise same role and have some different responsibilities at EMM compared to Union Home, but this does not mean he is not working in a similar capacity—particularly given the core responsibility at both companies was the origination of loans.[7]  Thus, the evidence before the Court shows that Fratelli has engaged in "Competitive

---

[7] Fratelli's arguments seeking to distinguish his current role based on mere facilitation are unavailing because facilitating the origination of loans is also barred under the Agreement, which bars directly and *indirectly* originating

Activity" as defined by the Agreement and has therefore breached the non-compete provision of the Agreement.

Evidence also shows that Fratelli breached the non-solicitation of customers provision of the Agreement. Fratelli contends that he did not breach the non-solicitation provision because he did not solicit or actively reach out to any past customers. (ECF No. 41, PageID #939). Even accepting this as true, the mere acceptance of business from past customers would breach the non-solicitation provision. (ECF No. 38-1. PageID #908). Since joining EMM, Fratelli has accepted business from customers and identified prospective customers with whom he worked with during his last 36 months of employment at Union Home, in direct violation of the non-solicitation provision. (ECF No. 55, PageID #1571–84, 1629–35; *Compare* Pl.'s Exs. 15–17, *with* Pl.'s Exs. 19, 20, 64).

Even if Fratelli breached the non-compete and non-solicitation of customers provisions, Union Home must demonstrate that the restrictive covenants underlying its breach of contract claims are enforceable under state law to establish a likelihood of success on the merits. *Cromer*, 31 F.4th at 367. Fratelli contends that the restrictive covenants in question are unreasonable and therefore unenforceable. (ECF No. 59, PageID #2905–13). Union Home disagrees, arguing the restrictive covenants are narrowly tailored, reasonable, and enforceable. (ECF No. 56, PageID #1723–28).

"Under Ohio law, 'only reasonable noncompetition agreements are enforceable.'" *Id.* (quoting *Lake Land Emp't Grp. of Akron, LLC v. Columber*, 101 Ohio St. 3d 242, 2004-Ohio-786, 804 N.E.2d 27, 33 (Ohio 2004)). Evaluating the factors under *Raimonde v. Van Vlerah*, the Sixth Circuit has held that a reasonable noncompetition agreement must: "(1) be 'no greater than is

---

mortgages for real estate. (ECF No. 38-1, PageID #908).

required for the protection of the employer,' (2) 'not impose undue hardship on the employee,' and (3) not be 'injurious to the public.'" *James B. Oswald Co. v. Neate*, 98 F.4th 666, 673 (6th Cir. 2024) (quoting *Raimonde v. Van Vlerah*, 42 Ohio St. 2d 21, 325 N.E.2d 544, 547 (Ohio 1975)). The Sixth Circuit clarified that: (i) non-compete clauses "will be enforced only to the extent that the restraints imposed thereby are reasonably necessary to protect the employer's legitimate business interests"; (ii) a movant must establish all three of the *Raimonde* elements by clear and convincing evidence; and (iii) a district court "should keep in mind nine fact-specific considerations" when evaluating reasonableness of a restriction. *Id.* (internal quotation marks and citations omitted).

The nine fact-specific considerations enumerated in *Raimonde* are:

1. Whether the restriction is temporally and spatially limited;

2. Whether the employee represents the sole contact with the customer;

3. Whether the employee is possessed with confidential information or trade secrets;

4. Whether the covenant seeks to eliminate competition which would be unfair to the employer or merely seeks to eliminate ordinary competition;

5. Whether the covenant seeks to stifle the inherent skill and experience of the employee;

6. Whether the benefit to the employer is disproportional to the detriment to the employee;

7. Whether the covenant operates as a bar to the employee's sole means of support;

8. Whether the employee's talent which the employer seeks to suppress was actually developed during the period of employment; and

9. Whether the forbidden employment is merely incidental to the main employment.

*FirstEnergy Solutions Corp. v. Flerick*, 521 F. App'x 521, 526 (6th Cir. 2013) (citing *Raimonde*, 325 N.E.2d at 547); *Neate*, 98 F.4th at 673 n.4 (explaining that "the nine factspecific factors help

guide the analysis but are not individually necessary").  The Court acknowledges that Ohio law disfavors restrictive covenants and that a careful weighing of the reasonableness factors dictated in *Raimonde* is necessary to determine that the restriction is "reasonable to protect employers' legitimate business interests."  *MP TotalCare*, 648 F. Supp. 2d at 962.

a.    First Element –Necessary for Protection of the Employer

Although the Court agrees with Union Home that it has protectable legitimate business interests, it finds that the Agreement as written provides restrictions greater than necessary to protect those interests.  That said, the Court has analyzed the *Raimonde* factors and will use its authority to fashion reasonable covenants between the parties.  *See Raimonde*, 325 N.E.2d at 547 ("We hold that a covenant not to compete which imposes unreasonable restrictions upon an employee will be enforced to the extent necessary to protect the employer's legitimate interests. . . . Courts are empowered to modify or amend employment agreements to achieve such results.").  Such modification is further justified by the parties having consented to judicial modification of any covenant found to be overly broad and unenforceable as written and requested enforcement of any restriction "to the maximum extent permitted by law."  (ECF No. 38-1, PageID #909).

i.    <u>Legitimate business interests/elimination of ordinary competition</u>

"It is the employer's burden to prove that there is a legitimate business interest to be protected by a non-compete agreement."  *Total Quality Logistics*, 2024 U.S. App. LEXIS 25149, at *13 (internal quotation marks omitted).  Because restricting ordinary competition is not a legitimate interest, "[n]oncompete agreements are valid only when they restrict unfair competition."  *MetroHealth Sys. v. Khandelwal*, 2022-Ohio-77, ¶ 17, 183 N.E.3d 590, 596 (Ohio Ct. App. 2022); *see also Westco Grp., Inc. v. City Mattress*, Case No. 12619, 1991 Ohio App.

20

LEXIS 3878, at *9 (Ohio Ct. App. Aug. 15, 1991) ("The purpose in allowing non-competition agreements is to foster commercial ethics and to protect the employer's legitimate interests by preventing unfair competition -- not ordinary competition."). "Employers' legitimate business interests include 'limiting . . . a former employee's ability to take advantage of personal relationships the employee has developed while representing the employer to the employer's established client," "preventing a former employee from using his former employer's customer lists or contacts to solicit new customers," and "preventing a former employee from using the skill, experience, training, and confidential information the former employee has acquired during the employee's tenure with his employer in a manner advantageous to a competitor in attracting business." *Union Home Mortg. Corp. v. Jenkins*, No. 1:20-cv-02690, 2021 U.S. Dist. LEXIS 93872, at *20 (N.D. Ohio May 18, 2021) (quoting *UZ Engineered Products Co. v. Midwest Motor Supply Co.*, 147 Ohio App. 3d 382, 2001-Ohio-8779, 770 N.E.2d 1068, 1080 (Ohio Ct. App. 2001)). Protecting customer goodwill also represents a legitimate business interest that can support a reasonable non-compete restriction. *Total Quality Logistics, LLC v. EDA Logistics LLC*, 685 F. Supp. 3d 563, 574 (S.D. Ohio 2023).

The Court finds that Union Home has established legitimate business interests in protecting the Confidential Information and its own goodwill, and Fratelli does not provide any arguments disputing the existence of these legitimate interests. As discussed previously, Fratelli had access to the Confidential Information (customer and referral source lists) during his employment with Union Home and for some time after he started working for EMM. For the Confidential Information comprised of customer lists, the Court has found that they constitute protectable trade secrets. "[E]mployers have legitimate business interests in preventing a former employee from using the former employer's customer lists or contacts to solicit new customers and in preventing

a former employee from using the confidential information the former employee acquired during employment in a manner advantageous to a competitor." *Jenkins*, 2021 U.S. Dist. LEXIS 93872, at *25 (citing *UZ Engineered Prods.*, 770 N.E.2d at 1080); *see also Payne*, 2020 U.S. Dist. LEXIS 132097, at *21–24 (finding that Union Home, the plaintiff in that case, had protected business interests in its goodwill and confidential information)

Fratelli argues that the non-compete and non-solicitation of customers provisions are unreasonable because they seek to eliminate all competition instead of just unfair competition. (ECF No. 41, PageID #942; ECF No. 59, PageID #2909–11). The Court finds this argument unpersuasive. Under Ohio law, a preliminary injunction can protect against unfair competition gained through the use of customer lists and special training, as well as protect an employer's customer goodwill. *See Khandelwal*, 183 N.E.3d at 59. Although Fratelli had developed goodwill with customers and referral sources in his decade working in the residential home loan industry before his employment with Union Home, there is no dispute that he developed new contacts and enhanced preexisting relationships during the eight and a half years he worked at Union Home. (*See* ECF No. 55, PageID #1415–16, 1439–40, 1448, 1642; ECF No. 26-1, PageID #251–52). The Court agrees that enforcing the non-compete provisions to their fullest extent or to the extent requested by Union Home would be greater than necessary to protect its legitimate business interests. But, because the Court believes a modified, narrower injunction can sufficiently protect those interests, this *Raimonde* factor does not ultimately weigh against the imposition of a tailored injunction.

ii.     Geographic restrictions

Fratelli argues that the geographic restrictions for the two relevant provisions are overly broad and unreasonable. Under the Agreement, the geographic scope of the non-compete

22

provision was limited to any state in which Fratelli is legally able to originate or broker mortgages and had done so on behalf of Union Home in the 36 months preceding Fratelli's resignation from Union Home.  (ECF No. 38-1, PageID #908).  In this case, those states are Pennsylvania and Florida.  But Union Home now seeks a preliminary injunction that narrows the scope of the non-compete provision to the Identified Counties (the specific counties within Florida and Pennsylvania where Fratelli had originated loans for Union Home).  (ECF No. 26, PageID #242–43, 246; ECF No. 56, PageID #1738–39).

Fratelli argues that this narrower geographic restriction is still overly broad and unreasonable.  (ECF No. 41, PageID #940–41; ECF No. 59, PageID #2096–08).  The Court does not fully agree.  The Court notes that limiting the geographic scope of the non-compete clause to counties in which Fratelli originated loans for Union Home during the 36 months before his resignation is not necessarily unduly restrictive nor unreasonable.  "As a general matter, so long as the geographic scope corresponds to the geographic reach of the markets the person served while employed at the former employer, as the proposed enforcement does here, that supports enforceability."  *Cretor Constr. Equip. LLC v. Gibson*, 738 F. Supp. 3d 950, 961–62 (S.D. Ohio 2024).  That said, the Court finds that the geographic restrictions of the non-compete provision must be further narrowed to render the provision reasonable.  First, Fratelli asserts that he has originated no loans in Florida since starting at EMM and Union Home has provided no evidence that Fratelli: (i) has breached the non-compete by engaging in "Competitive Activity" in Florida during the "Restricted Period"; or (ii) presently intends to originate loans in Florida.  Thus, the Court finds that there is no need to enforce any non-compete restriction in the Florida counties identified by Union Home to protect any legitimate business interest.[8]

---

[8] There is also not the same threat of unfair competition against Union Home in Florida because Fratelli has originated no loans in Florida since leaving Union Home nearly two years ago.

Second, the Court finds that the geographic restriction should be limited to only the Identified Counties that fall within 75 miles of Harrisburg, Pennsylvania. Ohio district courts have found geographic restrictions up to 100 miles in radius to be reasonable and issued orders holding such restrictions. *See e.g.*, *Cretor Constr. Equip.*, 738 F. Supp. 3d at 961–62 (upholding a 100-mile radius non-compete restriction around a plaintiff's two offices); *Payne*, 2020 U.S. Dist. LEXIS 132097, at *26 (noting that 100 mile "geographic restrictions have not been found to be unduly restrictive" (citing *Am. Logistics Grp., Inc. v. Weinpert*, 2005-Ohio-4809, 2005 WL 2240987 (Ohio 8th App. Dist. 2005))); *Sheffield Metals Cleveland, LLC v. Kevwitch*, No. 1:17-cv-1120, 2018 U.S. Dist. LEXIS 41003, at *26 (N.D. Ohio Mar. 13, 2018) (finding that a 100 mile restriction to be reasonable); *see also Am. Logistics Grp., Inc. v. Weinpert*, 2005-Ohio-4809, ¶ 51 (Ohio Ct. App. 2005). Fratelli currently operates out of the Harrisburg, Pennsylvania area. (*See* ECF No. 59, PageID #2909). Two of the Identified Counties, Wayne County and Alleghany County, fall more than 75 miles outside of Harrisburg. The Court finds that restricting the geographic scope of the non-compete provision to the 16 Identified Counties within 75 miles of Harrisburg where Fratelli had originated loans within 36 months of his resignation from Union Home to be reasonable and enforceable. Such a tailored approach is not greater than necessary to protect Union Home's legitimate interest in protecting the goodwill it has cultivated with its clients and its confidential information.

The Court also finds the overall scope of the non-solicitation of customers provision to be reasonable. Fratelli argues that this provision's lack of a geographic scope renders it unduly broad and unenforceable. (ECF No. 41, PageID #940). But Ohio law permits customer-based restrictions in lieu of geographic restrictions. *See Klaus v. Hilb, Rogal & Hamilton Co. of Ohio*, 437 F. Supp. 2d 706, 734 (S.D. Ohio 2006) ("Under Ohio law, customer restrictions may substitute

24

for a geographic restriction.") (citing *Premix, Inc. v. Zappitelli*, 561 F. Supp. 269 (N.D. Ohio 1983)); *see also Matco Tools Corp. v. Urquhart*, 435 F. Supp. 3d 802, 810 (N.D. Ohio 2020) ("Such customer-based restrictions are permitted under Ohio law, as they protect existing customer relationships, while permitting the former franchisee to pursue other business opportunities."). The Agreement explicitly provides a customer-based restriction under the non-solicitation of customers provision, barring Fratelli from soliciting, diverting, or accepting business from "any customer or identified prospective customer of the Company: (i) with whom Employee had contact; or (ii) about whom Employee obtained or had access to Confidential Information, in conjunction with their employment in the thirty-six (36) months preceding the termination of Employee's employment with the Company."  (ECF No. 38-1, PageID #908).  Accordingly, the lack of a geographic restriction does not render the non-solicitation of customers provision unreasonable and unenforceable.

iii.    Temporal restrictions

Fratelli generally argues that the temporal restrictions for the non-compete and non-solicitation of customers provisions are unreasonable.  (ECF No. 41, PageID #941–42).  He also argues that the extension provision within the Agreement is an unjustifiable penalty and there is no evidence that a yearlong restriction is needed to avoid unfair competition.  (*Id.*; ECF No. 59, PageID #2908).

The original temporal restriction for the non-compete provision was for a period of less than two years, lasting from the date the Agreement was executed (July 7, 2022) to March 31, 2024.  (ECF No. 38-1, PageID #908).  This falls well within the range of temporal restrictions that Ohio courts have held to be a reasonable for restrictive covenants.  *See Handel's Enters. v. Schulenburg*, No. 4:18CV508, 2018 U.S. Dist. LEXIS 104851, at *14 (N.D. Ohio June 22, 2018)

25

("Courts within Ohio have consistently held that non-compete agreements with two-year durations are reasonable and enforceable."); *Seaman Corp. v. Flaherty*, No. 5:20-cv-443, 2020 U.S. Dist. LEXIS 161635, at *17 (N.D. Ohio Aug. 3, 2020) (finding that a two-year temporal restriction is "consistently upheld by Ohio courts as reasonable"); *Phantom Fireworks E. Region v. Harvey*, No. 19 CV 2424, 2020 Ohio Misc. LEXIS 5065, at *9 (Ct. Com. Pl. Jan. 6, 2020) (collecting cases where Ohio courts upheld three-year temporal restrictions); *Life Line Screening of Am., Ltd. v. Calger*, 145 Ohio Misc.2d 6, 19, 2006- Ohio 7322, 881 N.E.2d 932, 942 (2006) ("Numerous Ohio decisions have upheld contracts calling for two-year periods or longer."); *Procter & Gamble Co. v. Stoneham*, 140 Ohio App. 3d 260, 747 N.E.2d 268, 271 (Ohio Ct. App. 2000) (finding that a three-year non-compete period was reasonable); *Myers Servs., Inc. v. Costello*, No. CA-917, 1989 Ohio App. LEXIS 2725, 1989 WL 76464, at *12 (Ohio Ct. App. June 26, 1989) (finding that a non-compete agreement which barred competing with the defendant's former employer for two years reasonable).  By contrast, the temporal restriction for the non-solicitation of customers provision, as written, would have acted to restrict Fratelli's ability to solicit former customers from his date of resignation (April 3, 2023) to March 31, 2026, a period of nearly 3 years.  (*See* ECF No. 38, ¶ 37; ECF No. 38-1, PageID #908).

The Court finds that extending the restricted period pursuant to Union Home's request and the terms of the Agreement is not unreasonable.  Extending the non-compete and non-solicitation of customers provisions for one year from the issuance of this Order would result in the restricted covenants only being enforced for a single year.  Such a temporal restriction is well under the two-year range consistently accepted by Ohio courts.  Moreover, "Ohio law permits the extension of non-compete clauses when violated."  *Iron Workers Dist. Council v. Lauer*, No. 3:15-cv-00248, 2016 U.S. Dist. LEXIS 162513, at *5–6 (S.D. Ohio Nov. 23, 2016) (citing *Mitchells Salon & Day*

*Spa, Inc. v. Bustle*, 187 Ohio App. 3d 336, 2010 Ohio 1880, 931 N.E.2d 1172, 1178 (Ohio Ct. Ap. 1 2010)).  Based on Fratelli's breach of the Agreement, specifically the non-compete and non-solicitation of customers provisions, the Court finds that a one-year temporal restriction is warranted and reasonable.  *See Payne*, 2020 U.S. Dist. LEXIS 132097, at *26 (similarly extending a restrictive covenant by one-year based on a plaintiff's breach of contract).  Providing this restriction would reasonably protect Union Home's legitimate business interests, prevent rewarding Fratelli for blatantly violating the terms of the Agreement, and afford Union Home some of the protections bargained for in the Agreement.[9]  Thus, as modified, the temporal restrictions favor a finding of reasonableness.

iv.  Stifles inherent skill and experience of the employee

Fratelli argues that the restrictive covenants are unreasonable because they seek to stifle his inherent skill and experience; he contends that his talent and skills were not developed during his employment with Union Home.  (ECF No. 41, PageID #943–44; ECF No. 59, PageID #2911–13).  Fratelli has provided evidence that he developed most of his skills and established himself as a successful loan manager in the years prior to his employment with Union Home, and that Union Home specifically hired him based on that prior training and experience.  (ECF No. 57-1, PageID #1815–18; ECF No. 57-3, PageID #2139, 2298; ECF No. 55, PageID #1589–90, 1651–53, 1665).  Union Home has presented no arguments to refute these assertions.  The *Raimonde* factors addressing a Fratelli's inherent skills and professional development "require the Court to assess whether the employee obtained some skill, or training, or access to customers, on a former employer's dime, such that it would be unfair to allow the employee to exploit those new skills, training, or customers, to the benefit of a new employer who had not paid those resource-

---

[9] Contrary to Fratelli's assertion, the Court does not find that Union Home amending its request for injunctive relief to now impose the extension provision to be a dilatory tactic or improper.  (ECF No. 59, PageID #2908).

acquisition costs." *Cretor Constr. Equip.*, 738 F. Supp. 3d at 963–64 (citing *Arthur J. Gallagher & Co. v. Anthony*, No. 16-cv-284, 2016 U.S. Dist. LEXIS 116384, at *32 (N.D. Ohio Aug. 30, 2016), and *Hall v. Edgewood Partners Ins. Ctr., Inc.*, 878 F.3d 524, 529–30 (6th Cir. 2017)). While Union Home provided Fratelli access to training programs, and it is likely that he developed and honed some of his skills and talents during his eight plus years of employment with Union Home, Union Home has not particularly demonstrated that Fratelli significantly honed any of his skills during his tenure at Union Home. As a whole, this factor favors Fratelli, but the Court notes that this factor does not outweigh the other factors, nor does it render enforcement of the restrictive covenants unreasonable.

> v.    Benefit to Union Home is disproportionate to the harm to Fratelli/Sole means of support

For these two factors, Fratelli argues that the restrictive covenants are unreasonable because the non-solicitation of customers provision is overly broad and vague, Union Home selectively enforces its restrictive covenants, and enforcement of the restrictive covenants would bar his sole means of support. (ECF No. 41, PageID #943–45; ECF No. 59, PageID #2911–13). The Court agrees with Fratelli's argument that extending the non-solicitation of customers provision to "identified *prospective* customers" about whom Fratelli obtained or had access to via the Confidential Information is overly broad and disproportionately restricts competition. This district has rejected a similar restrictive covenant as unreasonable. In *Legacy Roofing Servs. LLC v. Fusco*, the district court observed that:

> [B]y sweeping in potential clients, the non-solicitation clause disproportionately restricts competition without relation to protectable Legacy Roofing interests.
>
> Although the scope of potential clients covered by the non-solicitation clause is limited to those clients that Fusco "received confidential information" about, this limitation is too nebulous to be meaningful. Not only would the limitation include potential clients that Fusco directly worked with, but it would also include any

28

potential client that Fusco may have heard about from others at Legacy Roofing. As such, this factor weighs against reasonableness.

710 F. Supp. 3d 553, 572 (N.D. Ohio 2024) (internal footnote omitted).

While the *Legacy Roofing* court found that restricting solicitation of potential customers was unreasonable, it also noted that limiting the restrictive covenant to just actual clients was reasonable and enforceable. *Id.* Adopting a similar approach, the Court will amend the non-solicitation of customers provision to remove the bar on soliciting prospective customers and limit it to actual customers of Union Home. Specifically, it will be limited to actual customers of Union Home that Fratelli had contact with, or about whom he had obtained or had access to through the Confidential Information, as part of his employment in the 36 months preceding his resignation from Union Home.

The Court finds Fratelli's arguments about Union Home's selective enforcement of restrictive covenants unpersuasive. First, none of the evidence cited by Fratelli particularly supports the contention that Union Home selectively enforces non-compete provisions. Second, this district has rejected this same argument in two prior cases involving Union Home seeking to enforce restrictive covenants against a former employee. In both *Union Home Mortg. Corp. v. Payne* and *Union Home Mortg. Corp. v. Jenkins*, the district courts opined that, even assuming Union Home had elected to selectively enforce a non-compete agreement, that does not relieve the former employees from their obligations to abide by the terms of their respective non-compete covenants. *See Payne*, 2020 U.S. Dist. LEXIS 132097, at *24–25; *Jenkins*, 2021 U.S. Dist. LEXIS 93872, *22–24. The same reasoning applies here.

Finally, the facts before the Court do not establish that enforcement of the restrictive covenants, specifically as amended by the Court, will bar Fratelli's sole means of support. The amended non-compete and non-solicitation of customers provisions will solely bar "Competitive

29

Activity" in the 16 Identified Counties in Pennsylvania within a 75-mile radius of Harrisburg, and solicitation of specific, actual customers of Union Home, for a limited one-year duration.  This does not completely eliminate Fratelli's ability to facilitate/originate loans for EMM, so long as they are outside the above restrictions.  In fact, there are several counties within a reasonable proximity of Harrisburg and within which Fratelli is free to originate loans for EMM (*e.g.*, Mifflin, Centre, and York Counties).  Furthermore, Fratelli testified that he currently owns and operates a property acquisition company and a title company.  (ECF No. 55, PageID #1575–76).  Thus, the Court finds that these factors favor reasonableness.

b. Second Element – Undue Hardship on Employee

The Court finds that the non-compete and non-solicitation of customers provisions, as they will be modified, will not impose undue hardship on Fratelli.  Ohio courts have recognized that a covenant which restricts or prevents a person from practicing his trade or profession for any period of time will suffer some level of hardship.  *AK Steel Corp. v. ArcelorMittal USA, LLC*, 2016-Ohio-3285, ¶¶ 19–20, 55 N.E.3d 1152, 1157 (Ohio Ct. App. 2016); *Capital City Mech., Inc. v. Bartoe*, 2024-Ohio-4550, ¶ 24 (Ohio Ct. App. 2024) ("All non-compete agreements create some level of hardship.").  As a result, Ohio courts maintain that a "determination that a covenant is unduly harsh requires a much greater standard than determining whether the covenant is merely unfair."  *Polyone Corp. v. Kutka*, 67 F. Supp. 3d 863, 871 (N.D. Ohio 2014) (quoting *Off. Depot, Inc. v. Impact Off. Prods., LLC*, No. 1:09-cv-2791, 2011 U.S. Dist. LEXIS 117733, at *41 (N.D. Ohio Oct. 12, 2011)) (internal quotation marks omitted); *see also AK Steel Corp.*, 55 N.E.3d at 1157 (explaining that "the *Raimonde* test requires more than just some hardship").

Fratelli's opposition briefs do not explicitly address the second *Raimonde* element of undue hardship.  His arguments about the restrictive covenants barring his sole means of support appear

30

to also apply as an argument for undue hardship.  But the Court has already found this argument unpersuasive.  As explained previously, the modified restrictive covenants will allow Fratelli the ability to facilitate the origination of loans in certain counties around the Harrisburg area, as well as the rest of Pennsylvania outside the proscribed area; they also preclude him from working with existing customers of Union Home in a way that would enable him to unfairly compete.  The restrictive covenants will only be in place for a limited one-year period.  These restrictions do not impose a severe or undue hardship on Fratelli; this element favors reasonableness.

c.      Third Element – Injurious to the Public

As for the third *Raimonde* element, the parties have not addressed this element and no evidence has been presented which establishes that enforcement of the restrictive covenants would be injurious to the public.  Thus, the Court finds that the modified non-compete and non-solicitation of customers provisions will not be injurious to the public and this element favors reasonableness.

With Union Home having demonstrated that Fratelli likely violated the Agreement's non-compete and non-solicitation of customers provisions, and the *Raimonde* elements favoring enforcement of the modified provisions, the Court concludes that Union Home has established a strong likelihood of success on the merits of his breach of contract claims related to the non-compete and non-solicitation of customers provisions.

3.      *Breach of Contract – Non-solicitation of Employees*

Under Count IX, Union Home alleges that Fratelli breached the Agreement's non-solicitation of employees provision because, while still an employee with Union Home: (i) he induced Anita Weikel to leave her employment with Union Home for EMM, a direct competitor;

31

and (ii) she became an employee with EMM and now works as a member of the "Fratelli Team."

(ECF No. 38, PageID #903).  The non-solicitation of employees provision in the Agreement states:

> During the Restricted Period and for two (2) years thereafter, [Fratelli] shall not, directly or indirectly, on behalf of themselves or a Competitive Entity, employ or seek to employ any person who is employed by [Union Home] or otherwise induce such person to leave his/her employment with the [Union Home].

(ECF No. 38-1, PageID #908).  The parties do not dispute that Ms. Weikel began working for EMM shortly after her employment ended at Union Home.

Fratelli argues that Union Home cannot establish a likelihood of success on its non-solicitation of employees claim because it cannot prove that he breached this provision of the Agreement.  (ECF No. 41, PageID #946–47; ECF No. 59, PageID #2916–17).  He contends that he did not induce Ms. Weikel to leave her employment with Union Home because Union Home fired her as part of a planned reduction in force; he further contends that she started working at EMM before Fratelli had resigned from Union Home.  (ECF No. 41, PageID #946–47; ECF No. 59, PageID #2916–17).

In support of his position, Fratelli testified at his deposition and the preliminary injunction hearing that: (i) Ms. Weikel had obtained a second full-time job and wanted to work part-time for Union Home; (ii) Fratelli had asked his direct supervisor (Craig Franczak) about Ms. Weikel continuing to work part-time and he said that it was not allowed; and (iii) Union Home had a company policy of not allowing employees to work another full-time job.  (ECF No. 55, PageID #1608, 1682; ECF No. 57-1, PageID #1778).  The parties do not dispute that Union Home terminated Ms. Weikel's employment as part of a planned reduction in force.  However, Union Home provides evidence that she was only included in the reduction in force at Fratelli's request. In a sworn declaration, Mr. Wright attests that Fratelli recommended Ms. Weikel as part of the reduction in force and Fratelli's lucrative loan volume was such that she "would not have been

32

included in the reduction in force but for [Fratelli's] recommendation."  (ECF No. 26-1, PageID #250–51).

Other than his own testimony, Fratelli has provided no documentation or other evidence of the existence of a Union Home policy that employees such as Ms. Weikel could not work part-time for Union Home while working another full-time job.  The emails cited and provided by Fratelli reveal that Craig Franczak (Fratelli's direct supervisor) and Jim Ferriter (Union Home's national retail sales manager) approved the inclusion of Ms. Weikel as part of the reduction in force only after Fratelli had informed Susan Stevenson (head of Union Home's "LOA department") that Fratelli said, "to go ahead and put [Ms. Weikel] on the layoff list for tomorrow." (Def.'s Exs. BB, CC).  This evidence belies Fratelli's argument and tends to show that Fratelli was one of the, if not one of the main, driving forces behind Ms. Weikel's inclusion in the reduction in force.

Additionally, text messages between Ms. Weikel and Fratelli reveal that, while Ms. Weikel was still a Union Home employee, Fratelli: (i) informed Ms. Weikel that he was leaving Union Home to work for EMM; (ii) suggested that she might be able to work for EMM part-time; (iii) spoke with someone at EMM who stated Ms. Weikel did not "need to take a draw" and just had to "keep [her] license open and active"; and (iv) provided Ms. Weikel with the contact information for Mr. Frey, an EMM executive.  (Pl.'s Ex. 2, FRATELLI_359–66).  In an email, Frey provides Fratelli with a web portal to apply for a Select Retail Loan Officer position at EMM, which he suggests Ms. Weikel should apply for.  (ECF No. 26-3, PageID #572).  Fratelli testified that he referred Ms. Weikel to EMM for employment while he and Ms. Weikel were both still employees at Union Home.  (ECF No. 55, PageID #207–08; ECF No. 57-1, PageID #1775–75).  The evidence before the Court demonstrates that Fratelli, when he had planned to leave Union

Home and begin working for EMM, a direct competitor with Union Home, suggested Ms. Weikel should apply to work at EMM, informed her that he would be working at EMM himself in the near future, and provided her with contact information to apply for a position at EMM.  Accordingly, the Court finds that there is a substantial likelihood that Union Home will succeed on the merits of its breach of contract claim with relation to the non-solicitation of employees provision.

As before, the Court must still determine whether this restrictive covenant is reasonable and enforceable under *Raimonde*.  Notably, Fratelli has not challenged the enforceability of the non-solicitation of employees provision.  Union Home has a legitimate business interest in preventing present and former employees from soliciting present and former co-workers to work for competitors.  Other courts have found similar restrictive covenants to be reasonable.  *See*, *e.g.*, *ClearOne Advantage, LLC v. Kersen*, 710 F. Supp. 3d 425, 434 (D. Md. 2024); *Heartland Payment Sys., LLC v. Stockwell*, 446 F. Supp. 3d 1275, 1284 (N.D. Ga. 2020) (finding that a 2-year employee non-solicitation covenant was reasonable where it prohibited employees from "directly or indirectly soliciting, recruiting, enticing, or hiring [any] of HPS's employees to work for a third party") (alterations adopted); *Merritt Hawkins & Assocs., LLC v. Gresham*, 79 F. Supp. 3d 625, 639–40 (N.D. Tex. 2015) (upholding a 3-year covenant against soliciting all employees of a Fratelli's former employer).  The Court finds that the instant provision is no greater than necessary to protect Union Home's legitimate interest.  Nor does the record reflect Fratelli will suffer any undue hardship or the public will suffer any injury if this provision is enforced.  Thus, the non-solicitation of employees provision is enforceable.

As the pending motion for preliminary injunction primarily relates to enjoining ongoing violations of Counts I, II, III, VII, and IX of the amended complaint, the Court will not consider the likelihood of success of the remaining claims (Counts IV through VII).  The likelihood of

Union Home's success on Counts I, II, III, VII, and IX weighs in favor of granting the preliminary injunction.

### B.    Irreparable Injury

The second factor that the Court must consider "is whether the plaintiff will suffer irreparable injury without the injunction." *Certified Restoration*, 511 F.3d at 543.  Union Home maintains that it will suffer irreparable harm without a preliminary injunction because of unfair competition through Fratelli trading on the goodwill developed during his employment with Union Home and his misuse of confidential information.  (ECF No. 56, PageID #1733–34; ECF No. 61, PageID #2936).  Fratelli responds that Union Home cannot demonstrate any irreparable injury because there is no evidence that Fratelli possessed, used, or shared any protectable trade secrets. (ECF No. 41, PageID #947–48).  Fratelli further argues that there is no irreparable injury because any purported damages could be fully compensated through a monetary award—as Union Home can accurately calculate any alleged lost profits—and Union Home has provided no evidence that it lost any of its goodwill.  (ECF No. 59, PageID #2917–20).

"A plaintiff's harm from the denial of a preliminary injunction is irreparable if it is not fully compensable by monetary damages." *Overstreet v. Lexington–Fayette Urb. Cty. Gov't*, 305 F.3d 566, 578 (6th Cir. 2002).  "[A]n injury is not fully compensable by money damages if the nature of the plaintiff's loss would make the damages difficult to calculate." *Basicomputer Corp. v. Scott*, 973 F.2d 507, 511 (6th Cir. 1992) (citing *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 386 (7th Cir. 1984)).  "[I]nterference with customer relationships resulting from the breach of a non-compete agreement is the kind of injury for which monetary damages are difficult to calculate." *Certified Restoration*, 511 F.3d at 550.  The loss of fair competition resulting from the breach of a non-compete covenant is likely to irreparably harm an employer. *Id*.; *Basicomputer*

35

*Corp.*, 973 F.2d at 512.  The loss of customer goodwill is also irreparable.  *Hall v. Edgewood Partners Ins. Ctr., Inc.*, 878 F.3d 524, 530 (6th Cir. 2017); *see Off. Depot, Inc.*, 2011 U.S. Dist. LEXIS 117733, at *35 ("In the context of non-competes, courts have consistently held that the 'loss of customer goodwill often amounts to irreparable harm because the damages are difficult to compute.'" (citations omitted)).  Moreover, the Supreme Court of Ohio has held that injunctive relief is the "appropriate remedy to restrain the continued and future use, or threatened use, of misappropriated trade secrets."  *Valco Cincinnati, Inc. v. N & D Machining Serv., Inc.*, 24 Ohio St. 3d 41, 492 N.E.2d 814, 819 (Ohio 1986).

The Court agrees with Union Home that it would suffer irreparable harm if a preliminary injunction is not issued.  As discussed above, Union Home has demonstrated a likelihood of success on the merits for its claims of misappropriation of trade secrets, breach of the non-compete provision, and breach of the non-solicitation of customers provision.  Without an injunction, Fratelli would be free to continue to exploit the Confidential Information he acquired before leaving his employment with Union Home, as well as the goodwill he established/strengthened with Union Home's customers during his employment with Union Home, to compete against Union Home.  As a result, Union Home would suffer irreparable harm because any damages from the loss of goodwill and any unfair competition from Fratelli's breach of the non-compete and non-solicitation provisions would be difficult to calculate.

The Court finds Fratelli's argument that Union Home can be adequately compensated because it can calculate any alleged lost profits caused by Fratelli unpersuasive.  Fratelli cites portions of the transcript from the preliminary injunction hearing to support his argument.  (ECF No. 59, PageID #2918 (citing ECF No. 55 at PageID #1459, 1482–83, 1507)). But the Court disagrees with Fratelli's interpretation of the cited testimony.  While the testimony reflects that

Union Home might be able to calculate some lost sales or profits since Fratelli's departure from the company, there is no concession or indication that Union Home could calculate all damages attributable to any business lost based on any unfair competition.

The Employment Agreement also states that: "In the event Employee violates any covenant set forth herein, Employee agrees that such violation will cause irreparable harm to Company and Employee consents to the issuance of a restraining order and/or an injunction."  (ECF No. 38-1, PageID #909).   Thus, Fratelli explicitly agreed that any breach of the non-compete, non-solicitation, and confidential information covenants would constitute irreparable harm for purposes of an injunction.  Although such a contractual provision is not dispositive or sufficient evidence by itself, it is appropriate evidence for the Court to consider when making an irreparable harm determination.  *See York Risk Servs. Grp., Inc. v. Couture*, 787 F. App'x 301, 308 (6th Cir. 2019) (providing that a district court may consider a contractual stipulation of irreparable harm as a "piece evidence in support of a finding of irreparable harm"); *Mktg. Displays Int'l v. Shaw*, 646 F. Supp. 3d 897, 907 (E.D. Mich. 2022) (considering a contractual provision to irreparable harm as evidence of irreparable harm); *see also America's Home Place, Inc. v. Myers*, No. 1:21-cv-00224-DCLC, 2021 U.S. Dist. LEXIS 182227, at *7–8 (E.D. Tenn. Sep. 23, 2021) ("While such a contractual provision 'cannot act as a substitute for a [finding] regarding injunctive relief,' it is evidence properly considered when determining whether a party has suffered irreparable harm at this stage." (quoting *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1266 (10th Cir. 2004) (alternation in original)).

Accordingly, this factor favors issuing a preliminary injunction.  But the Court separately finds that Union Home has failed to establish that it will suffer irreparable harm if there is no preliminary injunction issued with respect to the alleged violation of the non-solicitation of

employees provision.  First, none of Union Home's arguments about irreparable harm mention the alleged solicitation of Ms. Weikel and her subsequent employment with EMM.  Second, nowhere does Union Home contend that it suffered any harm, let alone irreparable harm, from Fratelli's solicitation of Ms. Weikel.  It has also offered no evidence or argument that the solicitation of Ms. Weikel and her subsequent employment at EMM, on its own, is responsible for the loss of any goodwill or resulted in unfair competition.  Finally, there is no evidence or even speculation that Fratelli will commit any future breaches of the non-solicitation of employees provision.  Without any evidence of actual or imminent harm with relation to this non-solicitation provision, there can be no finding of irreparable harm.  *See Abney v. Amgen, Inc.*, 443 F.3d 540, 552 (6th Cir. 2006) (explaining irreparable harm as harm that is "actual and imminent" rather than "speculative or unsubstantiated").  Thus, the Court concludes that no injunctive relief should be granted with respect to the non-solicitation of employees provision.  *See Patio Enclosures, Inc. v. Herbst*, 39 F. App'x 964, 967 (6th Cir. 2002) ("[T]he demonstration of some irreparable injury is a *sine qua non* for issuance of an injunction."); *Sterling Jewelers, Inc. v. Zale Corp.*, No. 5:12CV2823, 2012 U.S. Dist. LEXIS 185124, at *3 (N.D. Ohio Jan. 24, 2012) ("The failure to show irreparable harm, by itself, can justify the denial of preliminary injunctive relief without consideration of the other three factors.").

### C.    Substantial Harm to Others

Under the third factor, the Court must consider "whether the issuance of the injunction would cause substantial harm to others."  *Certified Restoration*, 511 F.3d at 550–51 (quoting *Tumblebus Inc. v. Cranmer*, 399 F.3d 754, 760 (6th Cir. 2005)) (internal quotations omitted). More specifically, the Court must assess "whether the preliminary injunction would harm the party enjoined or others, and if so, whether such harm outweighs any irreparable harm established by

the party seeking the injunction." *Extracorporeal Alliance, L.L.C. v. Rosteck*, 285 F. Supp. 2d 1028, 1045 (N.D. Ohio 2003). Union Home contends that an injunction will not harm third parties because it is specifically tailored to prevent unfair competition and it will not deprive the public of access to competent mortgage lenders in areas the injunction affects. (ECF No. 56, PageID #1734–35). Fratelli argues that an injunction will substantially harm others because it would severely restrict Fratelli's ability to support his family. (ECF No. 41, PageID #948; ECF No. 59, PageID #2920).

The Court finds that any potential harm caused to others by the issuance of a preliminary injunction is minimal and outweighed by the irreparable harm established by Union Home. As discussed previously, the Court will modify the non-compete and non-solicitation of customers provisions. A preliminary injunction enforcing these narrowly tailored provisions will not impose an undue burden and will allow Fratelli the ability to work for EMM around the Harrisburg area, albeit in a circumscribed and limited fashion for only one year. The modified and limited injunction contemplated by the Court will not substantially harm Fratelli and his family; nor would any such harm outweigh the potential harm to Union Home. Accordingly, the Court finds that this factor favors granting the preliminary injunction to the extent described above.

### D.      Public Interest

"The final factor to evaluate in deciding upon a motion for preliminary injunction is 'whether the public interest would be served by the issuance of the injunction.'" *Certified Restoration*, 511 F.3d at 551 (citation omitted). The Sixth Circuit has routinely acknowledged that the enforcement of valid employment contracts and the enforcement of valid restrictive covenants serves the public interest. *See Handel's Enters., Inc.*, 765 F. App'x at 125 ("We note, however, that the 'public interest is always served in the enforcement of valid restrictive covenants contained

in lawful contracts.'" (quoting *FirstEnergy Solutions Corp. v. Flerick*, 521 F. App'x 521, 529 (6th Cir. 2013))); *Certified Restoration*, 511 F.3d at 551 ("Enforcement of contractual duties is in the public interest.").  The Court also agrees that "the public interest is served by . . .  prohibiting misappropriation of trade secrets, and by condemning the theft of clients through unfair competition."  *Avery Dennison Corp. v. Kitsonas*, 118 F. Supp. 2d 848, 855 (S.D. Ohio 2000). The modified preliminary injunction involves the enforcement of an employment contract, the enforcement of restrictive covenants, and the alleged misappropriation of trade secrets, which are all issues of public interest.  The Court finds that issuing a preliminary injunction serves the public interest, so this factor supports granting a modified preliminary injunction.

In summation, all four factors support granting injunctive relief related to the non-compete and non-solicitation of customers provisions to the extent modified as described above.  As for the non-solicitation of employees provision, there is no irreparable harm established and therefore no injunctive relief is warranted.  Therefore, Union Home's motion for preliminary injunction (ECF No. 4) is **GRANTED IN PART** and **DENIED IN PART.**

## IV.  BOND

"The court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party to have been wrongfully enjoined or restrained."  Fed. R. Civ. Pro. 65(c). The Court has broad discretion in setting the bond amount.  *Static Control Components, Inc. v. Lexmark, Int'l, Inc.* 697 F.3d 387, 400 (6th Cir. 2012).  Union Home argues that only a *de minimis* bond is necessary because it has no reason to believe that Fratelli will lose his employment at EMM during the term of the requested injunction.  (ECF No. 56, PageID #1738).  Fratelli requests that the Court should, if it were to impose an injunction, require Union Home to post a significant

bond to cover Fratelli's lost compensation and EMM's lost profits.  (ECF No. 59, PageID #2920 n.10).  Given the narrow scope of the modified injunction, the Court finds that a $100,000 bond is sufficient.  While Fratelli testified that he was making a monthly average of $22,202.27 in salary and commission (which would equal a $266,427 yearly salary), (ECF No. 55, PageID #1574–75), the Court somewhat agrees with Union Home that the modified injunction will not necessarily limit Fratelli's ability to work for EMM, and he will still have the ability to generate loans and income during the term of the injunction.  Generally, the amount of bond in a non-compete/non-solicitation case should reflect "the potential loss of salary reduced by the possibility of other employment opportunities in non-restricted areas and other mitigating factors."  *Pitney Bowes Inc. v. Acevedo*, No. 08-21808, 2008 U.S. Dist. LEXIS 61194, at *17 (S.D. Fla. July 28, 2008).  The Court believes a bond in the amount of $100,000 reflects these concerns.  Based on the foregoing, pursuant to Fed. R. Civ. P. 65(c), the Court finds that $100,000.00 is an appropriate amount to set as bond, and the Court shall require Union Home to post same forthwith.

## V.     Conclusion

For the foregoing reasons, Union Home's motion for preliminary injunction (ECF No. 12) is **GRANTED IN PART** and **DENIED IN PART**.  For one year from the date of the Court's Order, Christopher Fratelli is enjoined from:

(i) competing with Union home in the home mortgage banking or brokering business as a loan officer or any similar role that directly or indirectly facilitates, originates, or generates loans in the following Pennsylvania counites—Adams, Bedford, Columbia, Cumberland, Dauphin, Franklin, Huntingdon, Juniata, Lancaster, Lebanon, Lycoming, Northumberland, Perry, Schuylkill, Snyder, and Sullivan;[10]

(ii) soliciting or accepting business from Union Home Mortgage Corp.'s customers with whom Christopher Fratelli previously had contact or about whom he obtained

---

[10] These are the Pennsylvania counties within 75 miles of Harrisburg, Pennsylvania in which Fratelli originated loans on behalf of EMM within the 36 months preceding his departure from Union Home.

confidential information during the 36 months preceding his termination of employment with Union Home Mortgage Corp.; and

(iii) using and/or disclosing the contents of the lists found in Union Home's Preliminary Hearing Exhibits 14, 15, 16, and 17.[11]

This Order shall remain in full force and effect until otherwise ordered by the Court. Within ten days of this Order, Union Home shall post a bond in the amount of One Hundred Thousand Dollars ($100,000.00).

**IT IS SO ORDERED.**

Dated: February 27, 2025

_Charles Fleming_

_____
**CHARLES E. FLEMING**
**U.S. DISTRICT COURT JUDGE**

---

[11] Exhibit 18, the Referral Source List, is not included because, as explained above, the Court determined that list was not a protected trade secret and injunctive relief is therefore unwarranted.